[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-15022

_____

D.C. Docket No. 3:10-cv-00547-BJD-PDB

RONALD W. CLARK, JR.,

Petitioner - Appellant,

versus

ATTORNEY GENERAL, STATE OF FLORIDA,
SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(April 27, 2016)

Before MARCUS, WILLIAM PRYOR and MARTIN, Circuit Judges.

MARCUS, Circuit Judge:

In this capital case, Ronald Wayne Clark, a state prisoner in Florida convicted of murder in the 1990 shooting and robbery of Ronald Willis, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The state trial court imposed a sentence of death. The judgment was later upheld by the Florida Supreme Court on direct appeal and again on collateral review. In this habeas petition, Clark contends that his attorney was ineffective during the penalty phase of his trial, that the sentencing court failed to consider mitigating evidence, and that the State violated his due process rights by suppressing material impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). The district court issued a lengthy order denying all relief. Having carefully reviewed the record and after taking oral argument, we affirm.

## I.

### A.

The essential facts adduced at Clark's trial revealed the following. On January 13, 1990, two teenagers walking along a dirt road in rural Duval County, Florida discovered checks with Ronald Willis's name on them, a crow bar, false teeth, and a bloody shirt. Suspecting some sort of wrongdoing, one of the teenagers told his mother what they had found and she called the police. Officers arrived at the scene and determined that it appeared to be the site of a violent crime.

Alerted by Willis's mother that the police had found these items, Willis's ex-wife, Debra Willis, and her sister-in-law, Sandra Hardee, began driving around looking for Ronald Willis when they saw a truck that belonged to Willis parked in front of the Oasis Motel. They approached the truck and began yelling, demanding to know where Willis was. A man at the hotel pointed out Ronald Clark and John David Hatch as the people who had driven the truck. Debra took the keys from the truck and locked it as Hardee went to the motel's office to call the police. While making the call, she heard Debra call for help. Upon exiting the office she saw Clark attack Debra, apparently trying to take the keys from her. After Debra kicked him in the groin, Clark tried to run away. Hardee attempted to grab him, but fell over. She noticed, however, that Clark was wearing Ronald Willis's boots. Clark and Hatch ran off before the police arrived. Later, Hardee and Debra identified Hatch and Clark from photo spreads provided by Detective Jerry Jesonek, who was investigating the matter.

Hatch was arrested on January 20, 1990. In exchange for a twenty-five-year prison sentence, he testified against Clark at trial. According to Hatch's account, on January 12, he and Clark had decided to walk or hitchhike to Jacksonville to shoot pool. They brought with them a gun that Hatch had stolen from a house he was remodeling. He testified that both he and Clark had been drinking and were under the influence, but that they both knew what was going on around them.

3

Willis stopped to give them a ride and, during the ride, Clark whispered to Hatch that he planned to steal the truck when they stopped. Hatch asked Willis to stop the truck so they could buy beer; both Hatch and Clark got out of the truck. Hatch testified that as he walked toward the back of the truck, Clark fired the stolen gun seven or eight times into the truck, shooting and killing Willis. Clark then turned toward Hatch, pointed the weapon at him, and shouted that they had to go. They got back into the truck and Clark drove away. Hatch was seated on the passenger side, and Willis was slumped over in the middle, having been shot.

Hatch and Clark drove to a secluded spot where Clark took Willis's boots and the money from his pockets, and together they rolled Willis's body into a ditch. Hatch and Clark then went to a restaurant and on to Hatch's ex-wife's apartment, where they engaged in some sort of confrontation. Clark and Hatch later retrieved the body, found cinder blocks in Clark's parents' house, tied the cinder blocks to the body, and threw Willis off the Nassau County Sound Bridge into the water below. Hatch said they went to an acquaintance's home the next day to buy drugs, before ending up at the Oasis Motel where the confrontation with Debra and Hardee occurred. Hatch and Clark then fled the state, eventually winding up in South Carolina.

On cross examination, Clark's attorney confronted Hatch three times with inconsistent statements he had made on previous occasions. Most significantly,

4

counsel confronted Hatch with remarks he had made to Detective Jesonek that he had been urinating -- and not simply walking away from the truck -- when he heard Clark shoot Willis. That statement was made on January 21, 1990, and was memorialized in a document that now forms part of the basis of Clark's Brady claim.

Detective Jesonek testified at some length about the homicide investigation. Among other things, he took a statement from Hatch after his arrest on January 20, which largely corresponded to Hatch's trial testimony, although the statement differed in describing where Hatch was when he heard the shots; it did not mention Clark telling Hatch that Clark planned to steal the truck when they stopped; and it made no mention of Clark having pointed the gun at him after the shooting. Jesonek also testified about his efforts to convince Clark to return to Florida from South Carolina. He said that during one conversation with Clark, Clark admitted to having been involved in the shooting. After Clark was arrested by South Carolina police and returned to Florida, Jesonek took Clark's statement. The statement was substantially the same as Hatch's in detailing the events as they transpired that night except that Clark said Hatch was actually the one who shot Willis. In addition to this role reversal, Clark described where the bullets had struck the victim's body and how the victim physically moved upon being shot.

Finally, the prosecution offered testimony from Officers Dolan Thomason

and William Brown, who were both involved in transporting Clark during a separate trial in Nassau County, Florida.  Both officers unambiguously testified that Clark admitted he killed Ronald Willis.

Clark testified in his own defense.  He averred that his statement to Detective Jesonek naming Hatch as the shooter was the truth.  In fact, he added, his back was turned during the actual shooting, but he saw Willis's wounds when they dumped Willis's body off the Nassau County Sound Bridge.  He flatly denied having told Officers Thomason and Brown that he had shot Willis.  In closing argument, Clark's counsel argued that Hatch was the mastermind and triggerman behind the crime.  After deliberating for just under two and a half hours, the jury returned a verdict finding Clark guilty of murder in the first degree, under a theory of felony murder, and guilty of robbery with a firearm.

**B.**

During the penalty phase of the trial, the prosecution called Lieutenant Charles Calhoun of the Nassau County Sheriff's Office.  Calhoun testified about the details surrounding Clark's previous Nassau County, Florida conviction for the October 29, 1989 murder of Charles Carter.  According to Calhoun, Clark, Carter, Hatch, and another friend were driving around and Clark tried to get the group lost.  They eventually stopped in a wooded area on County Road 108 and exited the car.  Clark then shot Carter in the chest with a .12 gauge shotgun, and then shot Carter

6

in the head, removed his boots, and rummaged through his pants, recovering about

$11. Clark was convicted and sentenced to death in Nassau County for that crime.[1]

After the judgment and sentence from the Nassau County conviction were entered

into evidence, the prosecution rested.

Clark's counsel, Henry Davis, then asked for a sidebar. He told the trial

court that Clark did not wish to present any mitigating evidence to the jury and did

not wish to testify himself. The trial judge excused the jury and conducted the

following lengthy colloquy in open court:

> The Court: Mr. Davis, we were having a discussion at the bench when you asked to approach the bench and I just thought it better to go ahead and ask the jurors to leave. Let's go ahead and start over.
>
> Davis: All right. Your Honor, I just wanted to advise the court that Mr. Clark has decided not to exercise his right to testify here or to present other evidence in mitigation. The court may recall that Mr. Clark was seen by

---

[1] The Florida Supreme Court later overturned Clark's death sentence for the murder of Charles Carter after concluding that several aggravating factors had been improperly found. Clark v. State, 609 So. 2d 513, 514–15 (Fla. 1992). In contrast, the mitigating evidence Clark offered regarding his alcohol abuse, emotional disturbance, and abused childhood "constitute[d] strong nonstatutory mitigation." Id. at 515, 516. "Having found that only one valid aggravating circumstance exists, and having considered the mitigation established by the record," the Florida Supreme Court concluded that the death penalty was "disproportionate when compared with other capital cases where the Court has vacated the death sentence and imposed life imprisonment," and reduced Clark's sentence to life imprisonment. Id. at 516. Notably, in Clark v. State ("Clark II"), 35 So. 3d 880, 891 (Fla. 2010), the Florida Supreme Court said that its decision to reduce Clark's sentence was based on the absence of aggravating factors, not on any finding that the trial court improperly rejected the mitigating evidence that had been presented or that the mitigating evidence would have been sufficient to overcome the aggravating factors had those factors been supported by the evidence.

two psychiatrists, Dr. Miller and Dr. [Barnard], and he was seen by Dr. [Macaluso] out of Tallahassee. They all submitted reports and he knows he can testify but he would like not to present that to the jury.

The Court: All right. Mr. Clark, will you please stand, sir? Mr. Clark, you understand, sir, that this is as much your hearing as it is their hearing, do you understand that?

Clark: Yes, sir.

The Court: And do you understand what happened, what Mr. Davis said, is that correct, is that you position in the case?

Clark: Yes, sir.

The Court: Okay. And have you had time to think about this and reflect on it and is this your desire not to call or present any testimony that Mr. Davis alluded do?

Clark: Yes, sir.

The Court: In regarding to your own testimony, did you wish to testify in this matter and tell the jurors anything about yourself or your past or your background, or anything about yourself, or where were you planning to go from here? Is there anything you want to tell them?

Clark: No.

The Court: You understand I would give you full opportunity to have your say if you want to have your say, that I will give you full

8

opportunity to say whatever you want to say at this time? I want to make it as clear to you as I can that this is as much your hearing as it is the State of Florida's hearing.

Clark:      Yes, sir.

The Court: Do you understand that?

Clark:      Yes, sir.

The Court: Okay. And you are feeling all right today?

Clark:      Yes, sir.

The Court: Are you having any trouble thinking or is your reasoning good today?

Clark:      Yes, sir.

The Court: Okay. Are you under the influence of any drugs or alcohol, or anything like that?

Clark:      No, I didn't take none today.

The Court: Okay. And you don't want any of this testimony presented, and you, yourself, do not want to testify or speak to the jury?

Clark:      I don't want the jury to know nothing. I want Mr. Willis to know that I did not kill Ronald Willis. That's all I've got to say.

The Court: Okay. Well, you understand, Mr. Clark, that we are in a little different proceeding at this time than that.

Clark:      Yes, sir.

The Court:    But this is your one and only opportunity and I wanted to afford you every opportunity that I could to say anything that you wanted to say to these 12 people that are going to make a recommendation to me and you do seem to be very coherent and you seem to have a good frame of mind in my discussions with you here this morning, but I wanted to afford you every opportunity that I could to speak to these people if you so wanted to.

Clark:    I don't want to.

The Court:    Okay.  Well, that is your decision and I'm certainly not going to force you or make you do something you don't want to do.  I guess this is something that you have thought about, you and Mr. Davis.  So, I just wanted to make sure and satisfy myself that you understood this proceeding that we are having here today and that this was as much your proceeding as it was the State's, and I would afford you to state anything you or whatever you want to state if you so desired.

Clark:    I don't have anything to say.

After defense counsel reiterated that it had no further evidence to present during the penalty phase of the trial, the judge again returned to Clark:

The Court:    All right.  At this time, Mr. Clark, I don't mean to be leaning on you but you realize I wanted to just double check before we begin the argument by the State and by Mr. Davis, I wanted to ask you if you wanted to testify or speak to the jury?

Clark:    No, sir.

The Court:  All right.  I would state that I have talked to Mr. Clark here this morning and I do find that he is clear, lucid, and has a clear understanding of these proceedings, and he has elected not to speak on his behalf, but I did want to give you a further opportunity if you did.

The penalty trial then moved to closing statements.  The prosecution argued that three aggravating factors were present: (1) Clark had previously been convicted of another capital offense or a felony involving the use of violence to some person; (2) the crime was committed while he was engaged in the commission of a robbery; and (3) the crime was committed for financial gain.  The prosecution highlighted the similarities between Clark's previous Nassau County homicide conviction and the present crime.

Davis, arguing on behalf of Clark, offered several different lines of attack. First, he suggested that the evidence in the case was not clear cut, as demonstrated by the two-and-a-half hours it took the jury to deliberate, and that Clark continued to hold himself out as an accomplice to Hatch's killing.  He also argued that the jury should consider that Hatch, whom he claimed was equally culpable, was sentenced to only 25 years in jail and, therefore, the jury should consider giving Clark an equivalent sentence.  Finally, Davis claimed that the jury should consider Clark's youthful age -- he was 21 at the time of the murder -- and his possible drunkenness as mitigating factors.

11

The trial judge instructed the jury that it could consider the three aggravating factors argued by the prosecution, but that the second and third factors would merge into one if the jury found them both.  The judge also instructed the jury that when considering mitigation, it could consider "any aspect of the defendant's character and any other circumstances of the offense including the age of the defendant at the time of the crime."

After deliberation, the jury recommended by a vote of 11 to 1 that Clark be sentenced to death.

## C.

Before sentencing Clark, the trial court held a <u>Spencer</u> hearing[2] pursuant to Florida law, affording the parties a final opportunity to argue before the judge whether the death penalty should be imposed.  Although Clark had declined to present any mitigation evidence to the jury, his counsel presented the trial judge with a series of reports written by mental health professionals regarding Clark's

---

[2] In <u>Spencer v. State</u>, 615 So. 2d 688, 690–91 (Fla. 1993), the Florida Supreme Court held:

> We contemplated that the following procedure be used in sentencing phase proceedings.  First, the trial judge should hold a hearing to: a) give the defendant, his counsel, and the State, an opportunity to be heard; b) afford, if appropriate, both the State and the defendant an opportunity to present additional evidence; c) allow both sides to comment on or rebut information in any presentence or medical report; and d) afford the defendant an opportunity to be heard in person. Second, after hearing the evidence and argument, the trial judge should then recess the proceeding to consider the appropriate sentence.  If the judge determines that the death sentence should be imposed, then, in accordance with section 921.141, Florida Statutes (1983), the judge must set forth in writing the reasons for imposing the death sentence.  Third, the trial judge should set a hearing to impose the sentence and contemporaneously file the sentencing order.

troubled background.  Testimony from the mental health experts regarding the findings memorialized in those reports had previously been presented unsuccessfully as mitigating evidence in Clark's Nassau County trial.

The reports presented Clark's extensive history of familial abuse, chemical dependency, and mental health issues.  Dr. Miller's report detailed Clark's strained relationship with his mother, including one instance when she "put a gun to his head when he was 13 years old and told him that she felt he would be better off dead and perhaps she would too."  Moreover, Clark reported being molested by his mother's female lovers on several occasions, including one brutal and sadistic experience.  Dr. Miller's report also listed Clark's previous criminal charges for sexual battery, grand theft auto, and breaking and entering, and explained that Clark's only hobby appeared to be the abuse of drugs and alcohol.  The report also noted that Clark had previously attempted suicide.  Dr. Macaluso's report covered much of the same ground, including the instances of child abuse.  Dr. Macaluso paid particular attention to Clark's drug and alcohol use.  Both of Clark's parents were alcoholics who engaged in extensive physical abuse toward each other. When Clark lived with his father, he often went without food because his father had instead spent all of his money on alcohol.  Clark himself began drinking alcohol at the age of five, was actively abusing alcohol by 15, and suffered from alcoholic blackouts beginning at the age of 19.  Clark began using drugs in the

seventh grade. Finally, Dr. Barnard's report included much of the same information. His report also noted that Clark had reported attempting suicide by cutting his wrists or overdosing on drugs some 20 to 30 times.

The trial judge indicated that he had read the mental health reports submitted by defense counsel. The two then engaged in the following colloquy:

> Davis: Yes, sir. Thank you, Your Honor. I would like to begin by asking the court to include in its consideration the reports by Dr. Peter [Macaluso], Dr. [Barnard], and Dr. Miller which are in the court file.
>
> The Court: They are in the court file?
>
> Davis: Yes, sir.
>
> The Court: I had remembered seeing some of those and I remember reading them. I'm not sure I read the doctor from Tallahassee. I remember reading Dr. [Barnard]'s and who was the other one you said?
>
> Davis: The report from Dr. Miller.
>
> The Court: I remember reading those. I don't recall if I read that one or not, but if it's in the court file then I will.
>
> Davis: Yes, sir. I have a copy here, I could tender it to the court.
>
> The Court: All right. Would you, please, and I will read that between now and Friday.

14

Davis explained that the reports contained extensive information about Clark's background, including his prolonged history of alcohol and substance abuse. The judge also provided Clark with one final opportunity to speak on his own behalf. Again, Clark declined.

The judge sentenced Clark to a lifetime prison term for his armed robbery conviction, to run concurrently with the murder sentence. The judge then observed that he had "carefully studied and considered all of the evidence, the testimony at trial and at the advisory sentencing proceeding, the applicable Florida statutes, the case law, and all other factors touching upon this case." Having considered both the statutory and non-statutory mitigating circumstances, the judge found that they were outweighed by the "great aggravating circumstances which exist to justify the sentence of death." Thus, the judge imposed a death sentence on Clark.

In addition to making these observations, the judge issued a sentencing opinion formalizing the defendant's sentence. In that opinion, the court found as aggravating factors Clark's previous conviction for another capital felony, Fla. Stat. § 921.141(6)(b), that the murder of Willis was committed during the commission of a robbery, Fla. Stat. § 921.141(6)(d), and that the murder was committed for pecuniary gain, Fla. Stat. § 921.141(6)(f). The opinion also found no statutory mitigating factors were present. As for non-statutory mitigating circumstances the court said only that "[t]here are no other aspects of Ronald

15

Wayne Clark's character or record, nor any other circumstances of the offense, which would mitigate in favor of Ronald Wayne Clark or his conduct in this matter." The court made no specific reference to the three mental health experts. The trial judge did observe, however, that "[t]he Court having considered both statutory and non-statutory mitigating circumstances, finds that there are no mitigating circumstances existing which would outweigh or outnumber the statutory aggravating circumstances in this case."

**D.**

Clark appealed his sentence to the Florida Supreme Court. He claimed the trial court erred by (1) allowing him to waive the presentation of mitigating evidence; (2) finding felony murder and pecuniary gain as separate aggravators; (3) failing to properly consider the mitigating evidence and failing to find that several mitigators had been established; (4) allowing hearsay testimony to establish Clark's prior conviction in Nassau County of first-degree murder; and, finally, (5) imposing a death sentence disproportionate to his crime. Clark v. State ("Clark I"), 613 So. 2d 412 (Fla. 1992). Only the third claim is relevant here. On that issue, the Florida Supreme Court held:

> Clark also argues that the trial court erred by failing to consider the mitigating evidence properly and to find that several mitigators had been established. The record is clear, however, that the trial court considered the mitigating evidence, including the psychiatric reports as noted in the sentencing order. The trial court

16

conscientiously performed its duty and decided that no mitigators had been established. The record contains competent, substantial evidence supporting the court's conclusion that Clark's death sentence is appropriate.

Id. at 414 (citations omitted). Florida's high court also rejected each of Clark's other claims and affirmed his conviction and death sentence. Id. at 415. The United States Supreme Court denied certiorari on October 4, 1993. Clark v. Florida, 510 U.S. 836 (1993).

**E.**

On November 16, 1994, Clark began his collateral attacks, filing a motion to vacate his sentence pursuant to Florida Rule of Criminal Procedure 3.850. The post-conviction court granted Clark an evidentiary hearing on several of his claims, including his claim that the state had knowingly withheld exculpatory evidence and/or presented misleading evidence. For reasons that are not reflected in the record, no hearing was conducted and the case languished without any action for several years.

On June 20, 2003, Clark filed what he termed a Supplement to Amended Motion to Vacate Judgments of Convictions and Sentences and, on September 8, 2005, the state court appointed attorney Harry Brody to represent Clark. With leave of the court, Clark filed a new 3.850 motion raising 21 claims. The court granted Clark an evidentiary hearing on three of them: (1) an alleged Brady violation; (2) ineffective assistance of trial counsel for having failed to present

17

mitigating evidence; and (3) ineffective assistance of counsel at the guilt phase of trial. An evidentiary hearing was conducted on February 26, 2007. Clark's attorney called two witnesses, the first of whom testified to allegedly newly discovered evidence that is not at issue today.

Clark's attorney then called Clark's trial counsel, Henry Davis (by then a state court judge), to testify about why he did not present any mitigating evidence to the jury during the penalty phase. Davis offered that the primary reason he did not present any mitigating evidence was that his client, Clark, instructed him that he did not want any such evidence presented since he had been convicted of homicide in Nassau County. Moreover, Davis believed that much of the mitigating evidence cut both ways and could actually prove harmful to Clark. Davis said that Clark had lived "the most traumatic painful life" he had ever encountered and the strategy in the Nassau County trial had been to present all of the mitigating evidence to the jury. But, in light of the death sentence recommended by that jury, a strategy designed to present all of the mitigation clearly had not worked. Davis concluded from the reaction of the jurors in Nassau County that the mitigating evidence had precisely the opposite of its intended effect. Among the evidence that Davis saw as cutting both ways was that, as a child, Clark tortured and killed animals for sport; he super-glued cats' eyes shut and threw the animals against walls. The evidence also revealed that Clark had sexually abused children as a

minor.  Indeed, Davis's investigation revealed that Clark's pattern of violence escalated as he got older.

Moreover, although Davis thought that lingering doubt was not a valid mitigating factor, he also believed that the jury might recommend life because the evidence was "far from overwhelming."  While Davis acknowledged that conceivably he could have presented mitigating evidence over Clark's objection, he did not believe it was strategically wise to do so.

Clark again declined to testify on his own behalf at the collateral hearing, although he told the court that he wanted his attorney to present evidence about bloody clothes that had not been presented by his trial attorney.  After the evidentiary hearing, Clark filed a pro se motion with the court, which the court construed as a motion to reopen the evidentiary hearing, because his counsel had not presented evidence to support all of his claims.  On September 24, 2007, the court denied Clark's pro se motion because he was then represented by counsel.

On September 17, 2007, the state post-conviction court denied Clark's motion for post-conviction relief in its entirety.  Among other things, for our purposes, the court denied Clark's Brady claim because he had made no showing that the state had suppressed any of the allegedly exculpatory statements; indeed, the evidentiary record indicated that the state had turned over the impeaching statements made by Hatch.  The court also denied Clark's ineffective assistance of

19

counsel claim, finding that the claim was procedurally barred because it had been raised on direct appeal and, in any event, failed because Davis had made a reasonable strategic decision not to present mitigating evidence. On appeal, Clark's attorney pressed only his ineffective assistance of counsel and newly discovered evidence claims.

During this time frame, Clark attempted to file a series of pro se motions, including a motion for an extension of time to file a brief that included his Brady claim, a motion to discharge his post-conviction counsel, and a motion to proceed pro se. Each motion was stricken or denied by the Florida Supreme Court. The Florida Supreme Court ultimately affirmed the trial court's denial of Clark's motion for post-conviction relief. Clark v. State ("Clark II"), 35 So. 3d 880, 886 (Fla. 2010). As for the claim that defense counsel's failure to present mitigating evidence at the penalty phase amounted to ineffective assistance of counsel, the court first found that the claim was procedurally barred because the Florida Supreme Court had determined on direct appeal that Clark had made a knowing and intelligent waiver of his right to present any mitigating evidence. Id. at 889. And to the extent the claim was cognizable, the Florida Supreme Court applied the Strickland standard and held that Clark's counsel had not provided objectively deficient performance, nor did the petitioner establish prejudice. Id. at 891.

20

**F.**

Clark filed this petition seeking federal habeas relief in the United States District Court for the Middle District of Florida on April 28, 2011, pursuant to 28 U.S.C. § 2254.  He raised seven claims, three of which are now on appeal.  The district court denied habeas relief.  Clark v. Sec'y, Fla. Dep't of Corr., No. 3:10-CV-547-J-39PDB, 2014 WL 4059131 (M.D. Fla. Aug. 14, 2014).  First, the district court dismissed Clark's ineffective assistance of counsel claim because it was procedurally defaulted.  Id. at *19.  The district court cited the Florida Supreme Court's determination that the claim could not be heard on post-conviction review because it had already been denied on direct appeal.  Id.  In the alternative, the district court concluded that the Florida Supreme Court had not unreasonably applied Strickland when it found that counsel's performance was neither deficient nor had it caused Clark any prejudice.  Id. at *23–25.

The district court also rejected Clark's claim that the trial court had failed to properly evaluate, consider, find, and weigh mitigating evidence.  Id. at *25–26.  Referencing the trial judge's statements that he had considered all of the mitigating factors, the district court found that the Florida Supreme Court had neither unreasonably applied clearly established federal law, nor had it unreasonably found the facts when it determined that the trial court considered the mitigating evidence presented.  Id.  Finally, the district court denied Clark's Brady claim.  Id. at *28–

21

31. Because Clark attempted to raise the matter pro se, the district court rejected the argument that the claim was procedurally defaulted. Id. at *29. But the district court denied Clark relief on the merits because he failed to establish that the statements had been suppressed by the state, that they would have been material to his defense, or that he would have been prejudiced had they actually been suppressed. Id. at *31.

The district court denied Clark a certificate of appealability. We granted a certificate on three questions: whether the failure to present mitigating evidence amounted to ineffective assistance of counsel; whether the trial court erred by failing to consider mitigating evidence; and whether Clark's due process rights were violated under Brady.

## II.

### A.

We review de novo a district court's denial of federal habeas relief. Peterka v. McNeil, 532 F.3d 1199, 1200 (11th Cir. 2008). No one disputes that the Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to Clark's habeas petition. Under AEDPA, if a petitioner's habeas claim "was adjudicated on the merits in State court proceedings," a federal court may not grant relief unless the state decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Under § 2254(d)(1)'s "contrary to" clause, we grant relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). Under § 2254(d)(1)'s "unreasonable application" clause, we grant relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. For § 2254(d)(1), clearly established federal law includes only the holdings of Supreme Court decisions -- not Supreme Court dicta and not the opinions of this Court. White v. Woodall, 134 S. Ct. 1697, 1702 (2014).

The Supreme Court has explained that, to satisfy § 2254(d), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). The state court need not cite or even be aware of Supreme Court precedent "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002). "[A]n 'unreasonable application of' [Supreme

23

Court] holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." Woodall, 134 S. Ct. at 1702 (quoting Lockyer v. Andrade, 538 U.S. 63, 75–76 (2003)). In other words, Clark must establish that no fairminded jurist would have reached the Florida court's conclusion. See Harrington, 562 U.S. at 103. And Clark must do so based only on the "record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 180 (2011).

AEDPA also requires that we give state court factual findings great deference. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "If [the AEDPA] standard is difficult to meet, that is because it was meant to be." Harrington, 562 U.S. at 102.

**B.**

Clark argues first that he received ineffective assistance of counsel because his trial attorney did not present mitigating evidence to the jury during the penalty phase. He claims that this decision was objectively unreasonable. Moreover, he argues that, had the evidence been presented, there is a reasonable probability that he would not have been sentenced to death. We are unpersuaded.

24

The State responds that Clark's ineffective assistance of counsel claim is procedurally barred from federal habeas review. The argument is based on the Florida Supreme Court's observation in Clark II that because the "claim was raised on direct appeal and found to be without merit, it is procedurally barred from being raised in postconviction proceedings." Clark II, 35 So. 3d at 889. While that may accurately recite state law, it does not work to procedurally bar claims on federal habeas review.

Indeed, controlling Supreme Court authority defeats this argument. The Court explained in Cone v. Bell, 556 U.S. 449, 465 (2009), that the purpose behind respecting a state procedural bar is to respect the state's interest in correcting its own mistakes -- an interest that is defeated when a petitioner fails to properly raise the claim before the state court. But that consideration is not present when the claim has been barred in state court because it has been presented twice:

> When a state court refuses to readjudicate a claim on the ground that it has been previously determined, the court's decision does not indicate that the claim has been procedurally defaulted. To the contrary, it provides strong evidence that the claim has already been given full consideration by the state courts and thus is ripe for federal adjudication.

Id. at 467. This conclusion has been echoed many times by the Supreme Court and this Court. See, e.g., Wellons v. Hall, 558 U.S. 220, 222 (2010); Williams v. Alabama, 791 F.3d 1267, 1274–75 (11th Cir. 2015); Green v. Nelson, 595 F.3d

25

1245, 1249 n.1 (11th Cir. 2010).  Clark's ineffective assistance of counsel claim is not procedurally barred.

Turning, then, to the merits, to succeed on his ineffective assistance claim, Clark must establish both deficient performance and prejudice: he must show both that "counsel's representation fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984); accord Wiggins v. Smith, 539 U.S. 510, 521 (2003); Darden v. Wainwright, 477 U.S. 168, 184 (1986).  Moreover, we do not apply Strickland de novo, but rather examine it through the prism of AEDPA deference.  28 U.S.C. § 2254(d)(1).  As the Supreme Court has noted, "[t]he standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  Harrington, 562 U.S. at 105 (citation omitted (quoting Strickland, 466 U.S. at 689, and Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)).  Thus, under this doubly deferential standard, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable."  Id. at 101; see also id. ("A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.").  And if, at a minimum, fairminded jurists could disagree on the correctness of the state court's decision, the state

26

court's application of Strickland was not unreasonable, and AEDPA precludes the grant of habeas relief. Id.

The Florida Supreme Court held that the performance of Clark's trial counsel was not unreasonable. This determination was neither contrary to nor an unreasonable application of clearly established Supreme Court law. Davis's performance did not fall below an objective standard of reasonableness because he reasonably determined that the mitigating evidence could cut both ways and thus could have harmed his client as much as it could have helped him. Moreover, having actually presented the same mitigating evidence once before in an earlier capital case tried in Nassau County, and having watched the jury reject the presentation and recommend a death sentence, counsel had sound reason, indeed, to decide against presenting the same evidence again.

We should add that there is no claim that Clark's attorney failed to fully investigate Clark's difficult upbringing. Rather, Clark says only that, after conducting a full investigation and presenting all of the evidence at his first trial, his attorney erred by determining that the harmful evidence likely to be introduced if he presented that evidence at the second trial outweighed its benefits. When faced with such a double-edged sword, an attorney is called on to make an informed strategic decision, one that we are loath to second-guess.

Our recent decision in Kormondy v. Secretary, Florida Department of Corrections, 688 F.3d 1244 (11th Cir. 2012), supports this conclusion. There, Kormondy was sentenced to death after presentation of evidence regarding his unsettled and abusive upbringing along with his history of drug and alcohol abuse. Id. at 1258. After the sentence was vacated and the case was remanded for resentencing, Kormondy's counsel declined to present mitigating evidence in an apparent attempt to preempt the State from introducing rebuttal evidence. Id. at 1262–63. Kormondy engaged in a long discussion with the trial judge asserting that he wanted to waive the presentation of such evidence. Id. at 1263–68. After Kormondy was again sentenced to death, he nevertheless challenged his attorney's performance, claiming that he received deficient representation because his lawyer failed to present mitigating evidence. Id. at 1280–81. We held that, given the double deference due to the Florida Supreme Court's decision under Strickland and AEDPA, Kormondy was not entitled to relief. Id. at 1283–84. In particular, we observed that evidence of drug and alcohol abuse as well as evidence of a difficult and impoverished upbringing were "two-edged sword[s]" that might "provide[] independent basis for moral judgment by the jury." Id. at 1283.

The considerations weighing against presentation of mitigating evidence in Clark's case are even stronger than in Kormondy's. Here, trial counsel testified at the evidentiary hearing about the breadth of the defendant's cruel and violent

28

behavior that would likely have been presented to the jury had he sought to present evidence of Clark's abusive childhood. The evidence included that Clark tortured and killed animals for sport, super-glued cats' eyes shut, threw animals against walls, sexually abused children, and reportedly enjoyed hurting people. The Florida Supreme Court did not unreasonably conclude that Clark's attorney made a reasonable strategic decision.

Further, just like the attorney in Kormondy, Clark's counsel had the benefit of seeing how the presentation of this evidence would affect a trial jury because he had unsuccessfully presented the same evidence to the jury in Clark's previous murder trial in Nassau County. That the death penalty in the first case was later overturned on appeal is of no moment because that decision was not handed down until after the trial at issue here. Indeed, Strickland instructs us that we must "eliminate the distorting effects of hindsight" in order to "evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. At the time counsel acted, there was nothing unreasonable about the decision.

Moreover, Clark's counsel did not render deficient performance when he followed his client's clear and explicit instructions not to present mitigation evidence to the jury. Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1244 (11th Cir. 2010) (holding that petitioner had not shown counsel was ineffective for failing to present mitigating evidence where client instructed counsel not to present

evidence and, in counsel's independent judgment, presentation of such evidence to the jury would have harmed client). Here, there is no dispute that Clark told Davis he did not want to present mitigating evidence. The trial judge engaged in lengthy and repeated colloquies with Clark in order to discern with clarity the defendant's wishes. The trial judge concluded that Clark clearly understood the proceedings and, despite having the opportunity to do so, elected not to present mitigating evidence or testify on his own behalf. In light of this clear instruction, we cannot find that Clark's counsel performed deficiently by declining to present mitigation evidence to the jury. Clark's ineffective assistance of counsel claim fails on the first Strickland prong.

## C.

Even if we look past Clark's failure to show that his trial counsel rendered deficient performance, he is unable to establish prejudice from the failure to present mitigating evidence to the jury, let alone that the Florida Supreme Court's determination that he was not prejudiced was unreasonable. Again, we can discount the probability that the jury here would have recommended that Clark not be sentenced to death even had the mitigating evidence been offered because, faced with that same mitigating evidence, the jury in Clark's Nassau County case recommended the death penalty. Moreover, the aggravators in this case include the unchallenged finding that the murder was committed during the commission of

a robbery and, even more powerfully, that Clark had previously been convicted of another capital felony committed under strikingly similar circumstances.  While it is possible that a different jury in a different county would have reached a different result when presented with the same mitigating evidence, Clark has made no persuasive argument as to why it is reasonably probable.  In sum, we cannot find that the Florida Supreme Court unreasonably applied Strickland when it concluded that Clark was not prejudiced by his counsel's failure to present mitigating evidence at the penalty phase.

### III.

Clark claims next that his rights were violated because the sentencing judge failed to consider the mitigating evidence his attorney presented during the Spencer hearing.  The Florida Supreme Court rejected this claim too on direct appeal, finding that "[t]he record is clear . . . that the trial court considered the mitigating evidence, including the psychiatric reports as noted in the sentencing order.  The trial court conscientiously performed its duty and decided that no mitigators had been established."  Clark I, 613 So. 2d at 414.  Clark is unable to overcome the Florida Supreme Court's finding of fact.[3]

---

[3] The precise standard for reviewing state court factual findings in habeas proceedings is somewhat murky.  Section 2254(d)(2) instructs that habeas relief may be granted where the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Section 2254(e)(1), meanwhile, commands that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and

31

The United States Supreme Court has held that the Eighth and Fourteenth Amendments require that a sentencer not be prohibited from considering as mitigation "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Eddings v. Oklahoma, 455 U.S. 104, 110 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978)).  The trial court may determine the appropriate weight to be afforded such mitigation, but it may not exclude such evidence, as a matter of law, from consideration altogether.  Id. at 114–15.  As we have explained, however, the Constitution "does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight."  Schwab v. Crosby, 451 F.3d 1308, 1329 (11th Cir. 2006).  All that is forbidden is for sentencing courts to give mitigating evidence "no weight by excluding such evidence from their consideration."  Eddings, 455 U.S. at 115 (emphasis added).  Thus, our consideration is "completed once it is established that a full hearing was conducted in which appellant's counsel was given an opportunity to present all of the

---

convincing evidence."  "The interaction between (d)(2) and (e)(1), which appear to articulate different standards for reviewing state factual findings, is an open question in this circuit."  Landers v. Warden, Atty. Gen. of Ala., 776 F.3d 1288, 1294 n.4 (11th Cir. 2015).  The Supreme Court has repeatedly declined to rule on how, exactly, these two provisions interact, see Brumfield v. Cain, 135 S. Ct. 2269, 2282 (2015); Wood v. Allen, 558 U.S. 290, 300–01 (2010), and our sister circuits have split on the proper interpretation, see Wood, 558 U.S. at 299 n.1.  Because Clark does not meet even the arguably more forgiving § 2254(d)(2) standard, we need not address the interaction between them here.

mitigation evidence." Baldwin v. Johnson, 152 F.3d 1304, 1323 (11th Cir. 1998) (quoting Palmes v. Wainwright, 725 F.2d 1511, 1523 (11th Cir. 1984)).

Here, Clark does not argue that he was denied the opportunity to present mitigating evidence. Rather, he contends that the sentencing judge erred because he failed to consider the evidence. He points to the judge's sentencing document, which made no express reference to the reports counsel had submitted detailing Clark's childhood and addiction issues. Clark argues that this omission collides with the Florida Supreme Court's requirement that "the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature." Campbell v. State, 571 So. 2d 415, 419 (Fla. 1990) (footnote omitted).

Of course, a violation of state law is not sufficient to entitle a petitioner to federal habeas relief. 28 U.S.C. § 2254(d)(1) (predicating habeas relief on a violation of "clearly established Federal law, as determined by the Supreme Court of the United States"). And, indeed, we have previously held that the failure to reference non-statutory mitigating circumstances in a sentencing report is an insufficient basis to entitle a federal habeas petitioner to relief. Card v. Dugger, 911 F.2d 1494, 1522 (11th Cir. 1990); Johnson v. Wainwright, 806 F.2d 1479, 1484 n.8 (11th Cir. 1986) (collecting cases).

Nor do we see any other basis to award Clark habeas relief on this claim. The Florida Supreme Court was not unreasonable -- let alone did it commit clear error -- when it found as a fact "that the trial court considered the mitigating evidence, including the psychiatric reports as noted in the sentencing order." Clark I, 613 So. 2d at 414. For one thing, the trial court said that it had considered all of the relevant information for sentencing. Parker v. Dugger, 498 U.S. 308, 314 (1991) ("We must assume that the trial judge considered all this evidence before passing sentence. For one thing, he said he did."); accord Baldwin, 152 F.3d at 1324; Johnson, 806 F.2d at 1484. Moreover, the judge's wording that it found no mitigating factors that "outweigh or outnumber the statutory aggravating circumstances in this case" is better understood as a conclusion that follows appropriate consideration rather than as evidence that no consideration was undertaken at all. See Parker, 498 U.S. at 318. Clark has not undermined or rebutted the state court's fact finding.

## IV.

Clark also claims that the prosecutor violated his due process rights by suppressing exculpatory or impeachment material in violation of Brady v. Maryland, 373 U.S. 83 (1963). In particular, he points to the alleged suppression of three statements. Although an evidentiary hearing on this issue and others was held by the state post-conviction court, Clark's attorney did not present any

evidence in support of the claim that the prosecution had suppressed any of these statements. On this basis, the post-conviction court denied Clark's <u>Brady</u> claims. Clark's post-conviction counsel failed to appeal the denial of Clark's <u>Brady</u> claim to the Florida Supreme Court. Clark did, however, file a pro se motion in state circuit court and before the Florida Supreme Court seeking to re-open the evidentiary hearing or otherwise raise the issue. These motions were all stricken or denied. The Florida Supreme Court did not consider Clark's <u>Brady</u> claim.

**A.**

Because the Florida Supreme Court did not consider this issue, we are required to determine first whether we are procedurally barred from considering it on federal habeas review. The Supreme Court described the procedural bar doctrine this way:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. The doctrine barring procedurally defaulted claims from

35

being heard is not without exceptions.  A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law.

Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012) (citations omitted).

Here, while we know the Florida Supreme Court struck Clark's pro se motions to raise his Brady claims, the record does not reflect the basis on which those motions were stricken.  A review of the Florida Supreme Court's docket sheet online reveals only that the motions were "stricken as unauthorized" but provides no more detail than that.  The State argues that Florida's high court followed a firmly established and regularly applied rule that a party on post-conviction appeal does not have the right to file pro se motions while represented by counsel.

Clark argues, however, that he did everything he could to present his claims through the appellate process.  Before both the post-conviction court and the Florida Supreme Court, Clark attempted to file a series of pro se motions, including a motion for an extension of time to file a brief that included his Brady claim, a motion to discharge his post-conviction counsel, and a motion to proceed pro se.  Clark also wrote repeatedly to his post-conviction counsel demanding, among other things, that his lawyer preserve all meritorious claims for federal review.  By doing so, Clark argues, he took every step he reasonably could have

36

taken to exhaust his claims and avoid the procedural bar the State now asks this Court to impose.

There has been no showing that the rule barring death-sentenced defendants from proceeding pro se in post-conviction collateral proceedings before the Florida Supreme Court was firmly established at the time Clark's case was before that court. To be sure, the Florida Supreme Court had previously held that appellants are not entitled to present their own appeals pro se while represented by counsel on direct appeal. Davis v. State, 789 So. 2d 978, 981 (Fla. 2001). And after Clark's appeal was settled, the Florida Supreme Court announced that it would apply the Davis rule to cases on post-conviction review. Gordon v. State, 75 So. 3d 200, 201 (Fla. 2011). But the State has referred us to no Florida Rule of Appellate Procedure, no published internal operating procedure in the Florida Supreme Court, and no state court opinion extant at the time Clark's case was decided that forbade the filing of a pro se brief in Clark's circumstances.

At oral argument in this Court, the State relied on the Florida Supreme Court's holding in Logan v. State, 846 So. 2d 472 (Fla. 2003), as firmly establishing the rule procedurally barring Clark's claim. But the case does nothing of the sort. Instead, the court in Logan wrote:

> We therefore dismiss the subject petitions as unauthorized and take this opportunity to announce that in the future, we will not entertain pro se extraordinary writ petitions from criminal defendants seeking

37

affirmative relief <u>in the context of pending trial court criminal cases</u>, where it is clear from the face of the petitions that the petitioners are represented by counsel in the pending criminal proceedings and the petitioners do not clearly indicate that they are seeking to discharge counsel in those proceedings.

<u>Id.</u> at 479 (emphasis added). This rule does not speak at all to the situation presented in Clark's case. Clark did not have a pending trial court criminal case; rather, he sought to present issues to the Florida Supreme Court in concert with a post-conviction case then pending in that court. At the time Clark's case was decided, we can find no firmly established rule prohibiting defendants from filing pro se motions with the Florida Supreme Court while represented by counsel in post-conviction collateral proceedings.

Nor has the State presented us with any authority supporting its view that the rule barring represented prisoners from filing pro se motions with the Florida Supreme Court on collateral review has been consistently followed. Indeed, all of the Florida Supreme Court cases the State cites relate to direct appeals or other inapposite circumstances. <u>See</u> <u>Sheppard v. State</u>, 17 So. 3d 275 (Fla. 2009) (holding that defendant cannot file a pro se extraordinary writ with the Florida Supreme Court while simultaneously being represented by counsel in an ongoing lower court proceeding); <u>State v. Tait</u>, 387 So. 2d 338, 339 (Fla. 1980) (holding that a defendant does not have the right to represent himself at trial while also enjoying the assistance of counsel). The State has not cited any case decided

38

before its decision in Gordon where the Florida Supreme Court followed a clearly established practice of denying defendants leave to file motions pro se where they are represented by counsel on collateral review. We are, therefore, required to address Clark's Brady claims on the merits.[4]

**B.**

The Supreme Court has long held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. A Brady claim has three components: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Allen v. Sec'y, Florida Dep't of Corr., 611 F.3d 740, 745–46 (11th Cir. 2010) (alterations in original) (quoting Strickler v. Greene, 527 U.S. 263, 281–82 (1999)). "The prejudice or materiality requirement is satisfied if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Id. at 746 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). The crucial question on that point is "whether the government's evidentiary suppressions, viewed

---

[4] In this procedural posture, we review the merits of Clark's Brady claim de novo. Blanco v. Sec'y, Fla. Dep't of Corr., 688 F.3d 1211, 1240 n.69 (11th Cir. 2012).

39

cumulatively, undermine confidence in the guilty verdict." Id. (citing Kyles v. Whitley, 514 U.S. 419, 434, 436–37, & n.10 (1995)).

Clark first says that the State suppressed Hatch's January 21, 1990 statement to Nassau County Detective Jesonek. In that written statement taken shortly after Hatch's arrest, Hatch claimed to be "taking a leak" when Clark shot Willis; he never mentioned that Clark told him of his plan to take Willis's truck; and he did not mention that Clark pointed a gun at him after shooting Willis. In contrast, in his trial testimony, Hatch testified that Clark shot Willis while Hatch was walking toward the back of the truck; that Clark whispered to Hatch that he planned to steal the truck when they stopped; and that after shooting Willis, Clark turned toward Hatch with the gun pointed at him and shouted that they had to go.

At an evidentiary hearing called to address the Brady issue, Clark's attorney elicited no testimony that Clark's trial counsel had not received Hatch's sworn statement to the police. Thus, we have nothing other than Clark's ipse dixit assertions to support finding that the prosecution suppressed material exculpatory or impeachment material. In fact, the evidence available in the record establishes the opposite: that the prosecution provided Clark with Hatch's statement. The record reflects that in the State's March 8, 1990 response to a demand for reciprocal discovery, the prosecution provided Clark with a "[w]ritten statement of Defendant Hatch." Even more damning to Clark's claim, his trial counsel cross-

40

examined and impeached Hatch using the very same statement. The record reflects

the following colloquy between Davis (Clark's counsel) and Hatch:

> Davis:    Now, in fact, you have stated earlier that you got out of the truck, you walked some place and you were in the process of urinating when you heard the gun fire, is that correct?
>
> Hatch:    That was my intention.
>
> Davis:    Well, you have stated, have you not, that you were, in fact, in the process of urinating?
>
> Hatch:    I was on the way to.
>
> Davis:    Do you remember being interviewed by Detective Jesonek?
>
> Hatch:    Yes, sir.
>
> Davis:    Didn't you tell him that you were urinating at the time that you heard the shots?
>
> Hatch:    I don't remember if I said I was or I was in the process of it. I was not using the restroom at that time.

Moreover, during the testimony of Detective Jesonek, the prosecutor introduced

into evidence Hatch's January 21, 1990 written statement and had Detective

Jesonek read it into the record. Davis registered no surprise and interposed no

objection indicating that he had previously been unaware of the statement. There

is simply no reason to find that the statement had been suppressed by the

prosecution.

Next, Clark claims that the State suppressed a May 9, 1990 report from prison officer Jeanette Sares that Hatch had threatened to kill Clark. According to the report, "David Hatch did threaten to kill inmate Ronald Clark, Hatch told us that he would 'do it' right in front of an officer, also that he would break Clark's neck." Clark alleges that this statement shows great animosity between Hatch and Clark, and that it too could have been employed to impeach Hatch's motivations for testifying against Clark. Just as with the allegedly suppressed written statement, however, Clark's post-conviction counsel failed to elicit any testimony (or make any other showing) at the evidentiary hearing that Clark's trial attorney had not received this statement. In the absence of any evidence that the prosecution suppressed this statement, we cannot conclude that Clark's Brady rights were violated.

Finally, Clark claims that the State suppressed Hatch's statement to State Attorney Howard Maltz on June 27, 1990, that he and Clark did not bury Willis's body because they were "too drunk to hold a shovel." This would have contradicted Hatch's trial testimony that while he and Clark had both been drinking and were under the influence on the night of the murder, they both knew what was going on around them. Again, Clark's post-conviction counsel failed to elicit any testimony or make any other evidentiary showing that Clark's trial attorney had not received this statement. And still again, in the absence of

evidence, we cannot find that the prosecution suppressed any <u>Brady</u> material.

Indeed, an additional response to Clark's demand for discovery from the State on

July 5, 1990, indicates that the prosecution turned over the "[s]worn statement of

John David Hatch."  That this disclosure followed the date of Hatch's statement so

closely suggests a reasonable likelihood that Hatch's statement to State Attorney

Maltz was disclosed to Clark.

### C.

Finally, to the extent Clark claims he should be granted an evidentiary

hearing on his <u>Brady</u> claim, his argument fails because he has not met the statutory

threshold for granting a hearing.  AEDPA provides that:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
> (A) the claim relies on--
>     (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>     (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).  Clark cannot show that the factual predicate for his claim could not have been previously discovered through the exercise of due diligence. Indeed, an evidentiary hearing was granted on this very topic.  Due diligence at that hearing would have led to the discovery of whatever evidence existed in support of this claim.  He is also unable to establish that no reasonable factfinder would have found him guilty of the underlying offense had the allegedly suppressed statements been presented at trial.

Clark argues, nevertheless, that he is not required to meet § 2254(e)(2)'s stringent requirements because he was diligent in pursuing this claim, even if his attorney was not.  He cites Burgess v. Commissioner, Alabama Department of Corrections, 723 F.3d 1308, 1319–20 (11th Cir. 2013), for the principle that where a petitioner has been diligent in developing the factual record, § 2254(e)(2) does not apply and the district court's denial of an evidentiary hearing is reviewed for abuse of discretion.  Passing over the question of whether Clark's pro se efforts constitute diligence in the face of his counsel's abandonment of the claim, the district court did not abuse its discretion in denying Clark an evidentiary hearing because, even if the state prosecutor had suppressed Hatch's statements, the differences between Hatch's trial testimony and his allegedly suppressed statements are not material.  Clark would not, therefore, be entitled to federal

habeas relief.  Under either standard, Clark is not entitled to an evidentiary hearing on his <u>Brady</u> claim.

The long and short of it is that Clark has failed to show that the Florida state courts based their decisions on unreasonable applications of clearly established federal law or unreasonable determinations of the facts.  Accordingly, we affirm.

**AFFIRMED.**

MARTIN, Circuit Judge, concurring in judgment:

I agree with the majority's holding that Mr. Clark is not entitled to relief on his ineffective assistance of counsel claim. The Florida Supreme Court's decision regarding counsel's performance was not an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court. See 28 U.S.C. § 2254(d). It is the majority's ruling on the prejudice prong of Mr. Clark's ineffective assistance of counsel claim, however, that causes me to write separately. To prevail on an ineffective assistance of counsel claim, a habeas petitioner must show both that his counsel's performance was deficient and that counsel's deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). Our panel is in agreement that Mr. Clark failed to carry his burden on the performance prong of the showing required by Strickland. Since I view the question of whether Mr. Clark was prejudiced by his counsel's performance as a close one, I would have preferred that the panel not reach that question.

I would have avoided analysis of the prejudice prong of Strickland's required showing here because I have questions about the Florida Supreme Court's ruling that Mr. Clark was not prejudiced when his lawyer failed to present any mitigation evidence to the jury during the penalty phase of his trial. In challenging a death sentence, a petitioner establishes prejudice by showing that "there is a

46

reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S. Ct. at 2069.

As set out in the majority opinion, Mr. Clark had two capital murder trials. In the first of these trials, in Nassau County, Florida, Mr. Clark presented mitigation evidence of his alcohol abuse and emotional disturbance, together with the emotional and sexual abuse he experienced as a child. See Clark v. State, 609 So. 2d 513, 515–16 (Fla. 1992). In the appeal of his Nassau County conviction, the Florida Supreme Court characterized Mr. Clark's evidence as "strong nonstatutory mitigation." Id. at 516. Of course precisely the same mitigation evidence of Mr. Clark's alcohol abuse, emotional disturbance, and the sexual abuse he endured as a child exists in this case arising out of Duval County, Florida. Nevertheless on postconviction review of Mr. Clark's Duval County conviction, the Florida Supreme Court said that he was not prejudiced by the failure to present the very same mitigating evidence. See Clark v. State, 35 So. 3d 880, 891 (Fla. 2010).

A reviewing court applying Strickland's prejudice standard must consider the potential effect of the unpresented mitigating evidence on the sentencing jury. See Porter v. McCollum, 558 U.S. 30, 41–43, 130 S. Ct. 447, 454–55 (2009) (per curiam). I recognize that the reweighing of aggravating and mitigating evidence

involves many factors and that the aggravating circumstances in Mr. Clark's Duval County trial may have been more powerful than those in his Nassau County trial. After all, the Duval County jury knew about Mr. Clark's Nassau County murder conviction. Still, I am mindful that even though the Duval County jury heard no mitigating evidence, it was not unanimous in recommending a sentence of death. Knowing that one juror voted for a life sentence for Mr. Clark even without hearing any of his "strong nonstatutory mitigation" evidence suggests to me that had such evidence been presented, more jurors may have voted for life. Because of the peculiarities of the prejudice question here, I would not have reached that issue. Nevertheless, I agree with the majority that this record does not entitle Mr. Clark to federal habeas relief.